**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 14 2019

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS
### JONESBORO DIVISION

|  |  |  |
|---|---|---|
| JOHANNES PIETER JANSE VAN RENSBURG, GRAHAM PATRICK THEUNISSEN, ZEP VAN WYK, JACOBUS JOHANNES RABIE, and SHAUN NIEUWOUDT, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 3:19cv8-DPM |
| ROBERT HOOD d/b/a HOOD BROTHERS FARMS, MICHAEL HOOD d/b/a HOOD BROTHERS FARMS, and HOOD BROTHERS FARMS, | ) ) ) ) ) | This case assigned to District Judge Marshall and to Magistrate Judge Harris |
| Defendants. | ) ) | |

## COMPLAINT

### PRELIMINARY STATEMENT

1.    Plaintiffs Johannes Pieter Janse van Rensburg, Graham Patrick Theunissen, Zep Van Wyk, Jacobus Johannes Rabie, and Shaun Nieuwoudt (collectively, "Plaintiffs") are five South African workers who were forced to work under abusive conditions by threats and coercion carried out by their employers, Defendants Robert Hood ("Rob Hood"), Michael Hood ("Mike Hood") (jointly, the "Hood Brothers"), and Hood Brothers Farms (collectively, "the Defendants"), while Plaintiffs were employed at Hood Brothers Farms in Earle, Arkansas, in 2018.

2.    Defendants brought Plaintiffs to the United States in February and March 2018 through the federal government's H-2A nonimmigrant worker program to perform agricultural work. As inducement to accept the job offers, Rob Hood, on behalf of Hood Brothers Farms,

1

promised Plaintiffs in writing to reimburse them the cost of airfare from South Africa to Arkansas, for which Plaintiffs were required to take out significant loans, within the first week of their employment. Despite this promise, and despite Plaintiffs' repeated requests to be reimbursed, Defendants refused to reimburse Plaintiffs' airfare once Plaintiffs were at the farm as a way of compelling Plaintiffs to keep working.

3.      At the farm, Plaintiffs endured frequent verbal abuse from the Hood Brothers throughout the workday; they were berated as "stupid fucks" from a "backwards, fucked-up country." The Hood Brothers also restricted Plaintiffs' movements and activities while they were not working, including using tracking mechanisms to monitor and control Plaintiffs' movements whenever they left the farm, and threatened to have Plaintiffs arrested, deported, or blacklisted at the U.S. Consulate if they did not do as they were told. Deeply indebted, and believing that the Hood Brothers could follow through on their threats, Plaintiffs felt compelled to continue working for Defendants despite the abusive conditions.

4.      When Plaintiffs attempted to speak to Rob Hood about reimbursement for their airfare and his frequent abuse, Rob Hood fired Plaintiffs Janse van Rensburg and Nieuwoudt on the spot, and Mike Hood ordered them to leave the farm by 10 a.m. the next morning. No longer able to withstand the abuse and monitoring, the remaining three Plaintiffs, Theunissen, Van Wyk, and Rabie, felt compelled to leave the farm as well.

5.      The next morning, as Plaintiffs were preparing to leave the farm, Rob Hood stormed into the bathroom and yanked Plaintiff Nieuwoudt out of the bath naked. Rob Hood ordered him and the other Plaintiffs off the property and threatened to have Plaintiffs arrested if they did not leave immediately.

6.      Plaintiffs assert claims against Defendants arising from violations of their rights

2

under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and the Fair Labor

Standards Act ("FLSA"), and claims for damages arising from breach of contract, fraud, and

promissory estoppel. Plaintiff Nieuwoudt brings individual claims for assault and battery against

Defendants.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 29 U.S.C. § 216(b) (Fair

Labor Standards Act ("FLSA")), 18 U.S.C. § 1595(a) (Trafficking Victims Protection

Reauthorization Act ("TVPRA")), and 28 U.S.C. § 1331 (subject matter jurisdiction).

8.      This Court has supplemental jurisdiction over Plaintiffs' state law causes of

action, including claims for breach of contract, fraud, and promissory estoppel, and Plaintiff

Nieuwoudt's claims of assault and battery, pursuant to 28 U.S.C. § 1367(a), because they are so

related to the federal claims that they form part of the same case or controversy.

9.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C.

§§ 2201 and 2202.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

11.     Defendant Robert ("Rob") Hood is a natural person residing in Crittenden

County, Arkansas.

12.     Defendant Rob Hood conducted business at all times relevant to this action during

the 2018 season as "Hood Brothers Farms."

13.     Defendant Michael ("Mike") Hood is a natural person residing in Crittenden

County, Arkansas.

14.     Defendant Mike Hood conducted business at all times relevant to this action

3

during the 2018 season as "Hood Brothers Farms."

15.     On information and belief, Hood Brothers Farms is a partnership under Arkansas law of which the general partners are Rob Hood and Mike Hood.

16.     Under Arkansas law, Defendants Rob Hood and Mike Hood, as general partners in the Hood Brothers Farms general partnership, are jointly and severally liable for any loss or injury caused to any person by the wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of the partnership, and are jointly liable for all other debts and obligations of the partnership.

17.     Hood Brothers Farms, operated by Defendants Rob Hood and Mike Hood, conducted business at 263 S. Hood Road, Earle, Arkansas 72331.

18.     On information and belief, Defendants operate rice, soy, and wheat fields in Earle, Arkansas.

19.     Plaintiffs are citizens and residents of South Africa who were admitted to the United States on a temporary basis pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) to perform agricultural labor planting, cultivating, and harvesting rice, soy, and wheat, and operating and repairing farm equipment and machinery for Hood Brothers Farms beginning in or around February or March of 2018. Plaintiffs received H-2A visas in 2018 pursuant to this statutory provision and were employed by Defendants under these visas.

20.     Plaintiffs Graham Theunissen, Jacobus Johannes Rabie, and Zep Van Wyk performed agricultural labor for Defendants in Arkansas from on or about February 28, 2018, to on or about April 5, 2018.

21.     Plaintiffs Shaun Nieuwoudt and Johannes Pieter Janse van Rensburg performed agricultural labor for Defendants in Arkansas from on or about March 8, 2018, to on or about

4

April 4, 2018, when they were unlawfully fired.

## FACTS

### Defendants' Participation in the Federal H-2A Visa Program

22.     An agricultural employer in the United States may import aliens to perform labor of a temporary nature if the U.S. Department of Labor ("DOL") certifies that: (1) there are insufficient available workers within the United States to perform the job; and (2) the employment of aliens will not adversely affect the wages and working conditions of similarly situated U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1). Aliens admitted in this fashion are commonly referred to as "H-2A workers."

23.     Agricultural employers seeking the admission of H-2A workers must first file a temporary employment certification application with the DOL. 20 C.F.R. § 655.130.

24.     This application must include a job offer, commonly referred to as a "clearance order" or "job order," that complies with applicable regulations and is used in the recruitment of both U.S. and H-2A workers. 20 C.F.R. § 655.121(a)–(c). The H-2A regulations establish the minimum benefits, wages, and working conditions that must be offered in order to avoid adversely affecting U.S. workers. 20 C.F.R. §§ 655.0(a)(2), 655.122, 655.135.

25.     Hood Brothers Farms hired temporary foreign workers, including South Africans, through the H-2A program for several years prior to the 2018 season.

26.     Alleging a lack of available, documented agricultural workers in the area of its operations, Defendants, using the name of "Hood Brothers Farms," filed an application to employ temporary foreign workers through the H-2A program during the 2018 rice, soy, and wheat season.

27.     This temporary labor certification application for the 2018 season sought

5

admission of ten workers for employment from February 15, 2018, to December 15, 2018, and was anticipated to provide workers with 48 hours of work per week.

28.     As part of its temporary labor certification application described in paragraphs 23–27, Hood Brothers Farms, through Rob Hood, included job offers that purported to comply with applicable H-2A regulations and were used in the recruitment of the H-2A workers. 20 C.F.R. § 655.121(a)–(c).

29.     Defendants' temporary labor certification application was approved, and the U.S. Department of Labor issued a clearance order ("Clearance Order"), allowing Defendants to recruit foreign workers.

30.     A true and correct copy of the Clearance Order is attached hereto as Exhibit A.

31.     Under the H-2A regulations, in the absence of a separate, written work contract entered into between the employer and the worker, a clearance order serves as the H-2A worker's employment contract.

32.     The H-2A regulations also mandate minimum terms of Plaintiffs' employment contracts, voiding as a matter of law any terms purported to be imposed by Defendants that do not meet these minimum terms.

### Defendants' Additional Terms of Employment

33.     In this case, in addition to the clearance order, Defendants, through Rob Hood, made promises to Plaintiffs in a separate written agreement signed by Rob Hood and each Plaintiff prior to Plaintiffs accepting the job offers.

34.     A true and correct copy of this contract ("Terms of Employment") is attached hereto as Exhibit B.

35.     Each Plaintiff and Rob Hood, as the agent of Hood Brothers Farms, signed the

6

Terms of Employment in November 2017, while Plaintiffs were still in South Africa, as a condition to Plaintiffs accepting the job offers.

36.     The Terms of Employment provided additional terms for the employment relationship, including:

      a.  Reimbursement, during the first week of employment, to each Plaintiff for reasonable costs incurred for transportation and daily subsistence from Plaintiffs' homes in South Africa to Defendants' farm in Earle, Arkansas. *See* Ex. B, ¶ 20;

      b.  Reimbursement of the consulate fee of $190 within 48 hours of the workers' arrival, *id.* ¶ 16;

      c.  No deductions from Plaintiffs' paychecks other than those specified in the Clearance Order, *id.* ¶ 21;

      d.  Hourly wages of $10.73, which was the Adverse Effect Wage Rate ("AEWR") in Arkansas for the 2018 season, *id.* ¶ 4;

      e.  A two-week orientation period to learn the operating procedures of Hood Brothers Farms, *id.* ¶ 2;

      f.  In the case of difficulties with operating farm equipment, two five-hour sessions to familiarize Plaintiffs with the farm equipment prior to terminating any Plaintiff for failing to properly operate the equipment, *id.* ¶ 22; and

      g.  A prohibition on termination in the "heat of the moment," *id.* ¶ 26.

37.     Plaintiffs understood the Terms of Employment to be a written agreement as to the terms of their employment and considered the signing parties bound to its terms.

38.     Rob Hood, as agent for Hood Brothers Farms, signed the Terms of Employment,

knowing that the terms contained therein would induce Plaintiffs to agree to accept the job offers.

39.     In deciding whether to accept the job offers, Plaintiffs were particularly concerned with the reimbursement of the airfare, as the cost of flights from South Africa to Arkansas would require each of them to take out substantial loans. Plaintiffs considered the Terms of Employment's provision guaranteeing reimbursement of airfare and other transportation expenses within the first week of employment a material term, and each Plaintiff accepted the job offer in reliance on that provision.

40.     In addition, as a condition of accepting the job offer, each Plaintiff was required to take a "stress test" to determine whether Plaintiffs could withstand Rob Hood's temperament. Plaintiffs were told that Rob Hood would reimburse Plaintiffs for the cost of the tests.

### Plaintiffs' Travel and Arrival at Hood Brothers Farms

41.     In February 2018, Plaintiffs Theunissen, Van Wyk, and Rabie traveled at their own expense from their homes in South Africa to Defendants' farm in Earle, Arkansas.

42.     In March 2018, Plaintiffs Nieuwoudt and Janse van Rensburg traveled at their own expense from their homes in South Africa to Defendants' farm in Earle, Arkansas.

43.     To reach the Hood Brothers' farm, Plaintiffs were required to pay various fees and expenses, including but not limited to visa fees and transportation expenses from their hometowns in South Africa.

44.     In reasonable reliance on Rob Hood's written promise to repay the airfare, consulate fees, and daily subsistence costs within the first week of work, Plaintiffs undertook considerable economic, familial, and personal sacrifices, including assumption of significant interest-bearing debt.

45.     Each Plaintiff expended between approximately 21,613 Rand (about USD $1,786) and 28,609 Rand (about USD $ 2,352) for transportation, visa and consular fees, and daily subsistence to reach Defendants' farm.

46.     But for Plaintiffs' employment with the Hood Brothers, they would not have incurred the expenses described in paragraph 45, other than daily subsistence.

47.     Other than daily subsistence, the expenses described in paragraph 45 that Plaintiffs incurred were necessary to their employment with Defendants.

48.     Other than daily subsistence, the expenses described in paragraph 45 that Plaintiffs incurred primarily benefitted Defendants.

49.     During Plaintiffs' respective first workweeks, Defendants reimbursed Plaintiffs approximately four-hundred dollars each, presumably to cover some of their inbound costs. However, the payment did not come close to covering the costs of Plaintiffs' travel and consulate expenses.

50.     Concerned about their debts, some of which were interest accruing, Plaintiffs immediately and repeatedly asked Rob Hood for the airfare reimbursement, as promised in the Terms of Employment. Plaintiff Rabie specifically told Rob Hood that he had borrowed the money for airfare and needed to repay it promptly and that he had relied on Defendants' promise in the Terms of Employment.

51.     Even after Plaintiffs' repeated requests for the reimbursements, Rob Hood did not pay the reimbursements, replying once that he would reimburse their expenses once Plaintiffs proved their "loyalty."

52.     At another point, Rob Hood told Plaintiffs Theunissen and Rabie that he had never reimbursed prior H-2A workers for travel expenses and that he believed he was under no

obligation to do so. He falsely stated that Plaintiffs' work contracts made no mention of travel reimbursements.

53.     The expenses described in paragraph 45 functioned as de facto deductions from Plaintiffs' wages during their first workweek at Hood Brothers Farms in 2018.

54.     The deductions described in paragraph 45 caused Plaintiffs to earn less than the AEWR and the federally mandated minimum wage during their first workweek at Hood Brothers Farms in 2018. Each Plaintiff's total earnings during his first workweek ranged from approximately $100 to $250, but each had already incurred in excess of $1,700 in expenses.

## Plaintiffs' Employment at Hood Brothers Farms

55.     While working at Hood Brothers Farms in 2018, Plaintiffs were engaged in the production of goods, including rice, soy, and wheat, for commerce, as that phrase is used in the FLSA.

56.     While working at Hood Brothers Farms in 2018, Plaintiffs were employed in an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1).

57.     While working at Hood Brothers Farms in 2018, Plaintiffs worked on rice, soy, and wheat that moved in interstate commerce.

58.     While working at Hood Brothers Farms in 2018, the Plaintiffs handled materials, including rice, soy, wheat, and tools that moved in interstate commerce.

59.     On information and belief, in 2018, Defendants had at least $500,000 in gross volume of sales made or business done.

60.     Rob Hood, as agent of Hood Brothers Farms, signed both employment contracts with Plaintiffs. Rob Hood directed and supervised Plaintiffs' work and regulated Plaintiffs' work

hours, payment, and travel reimbursement. He signed Plaintiffs' hours records and paychecks on behalf of Hood Brothers Farms. Rob Hood terminated all Plaintiffs' employment.

61.    Although Rob Hood petitioned for the H-2A workers on behalf of Hood Brothers Farms, Mike Hood was also Plaintiffs' employer and supervisor, as well as the sole owner of the property at 263 S. Hood Road, Earle, Arkansas 72331, where Hood Brothers Farms conducted business.

62.    Pursuant to the common law and the H-2A regulations, 20 C.F.R. § 655.103(b), Rob Hood and Mike Hood , as general partners of the general partnership Hood Brothers Farms, acted as joint employers of Plaintiffs Theunissen, Van Wyk, and Rabie between February and April 2018 and of Plaintiffs Nieuwoudt and Janse van Rensburg between March and April of 2018 because:

  a.  Rob Hood and Mike Hood determined what work Plaintiffs would perform each day on Hood Brothers Farms, supervised Plaintiffs' assigned work, determined whether Plaintiffs' work was of adequate quality, and decided whether Plaintiffs needed to make corrections to their work;

  b.  Rob Hood and Mike Hood determined what hours Plaintiffs would work each day and told Plaintiffs when their work was complete for the day;

  c.  Rob Hood and Mike Hood supplied all materials that Plaintiffs used to plant, cultivate, or harvest rice, soy, and wheat;

  d.  Plaintiffs performed all of their work for Rob Hood and Mike Hood on property owned by Mike Hood and controlled by both Hood Brothers;

  e.  Rob Hood and Mike Hood retained the power to discharge Plaintiffs from work on Hood Brothers Farms at any time;

11

      f.   Rob Hood signed and distributed to Plaintiffs hours records and checks marked as Hood Brothers Farms, for which Rob Hood and Mike Hood were general partners; and

      g.   Rob Hood and Mike Hood determined when Plaintiffs were to evacuate the premises after termination.

63.     As joint employers, Rob Hood and Mike Hood were contractually bound to Plaintiffs by the terms of work set forth in Exhibits A and B, 20 C.F.R. § 655.122(d)-(q), and 20 C.F.R. § 655.135(d).

64.     In addition to the five H-2A workers employed at Hood Brothers Farms during the 2018 season, Defendants employed at least one U.S. citizen, Pat Greer, as the foreman.

65.     Despite the term in the Terms of Employment guaranteeing a two-week orientation period, the Hood Brothers provided Plaintiffs with only brief verbal instructions regarding how to operate the farm equipment.

66.     Plaintiffs were forced to apply their knowledge of how to operate the farm equipment from prior experience. However, much of the farm equipment at the Hood Brothers' farm was more technologically advanced than the equipment several Plaintiffs had used in South Africa and, thus, was largely unfamiliar to most Plaintiffs.

67.     From early on in their employment, the Hood Brothers began verbally abusing the Plaintiffs. Rob Hood regularly spewed insults at Plaintiffs, such as calling them "stupid South Africans" and "stupid fucks" and referring to South Africa as a "shit country" and a "fucked-up, backwards country." He threatened to send Plaintiffs back to South Africa if he heard them speaking to each other in Afrikaans, their native language, instead of in English.

68.     Mike Hood, who also supervised and instructed Plaintiffs in their work, likewise

insulted and demeaned Plaintiffs, calling them "a bunch of goddam animals" and referring to South Africa as a "backwards" country.

69.     In addition to the insults, Rob Hood focused his ire on Plaintiffs Nieuwoudt, Van Wyk, and Janse van Rensburg, erupting at them if they performed a task in a different manner than he preferred it to be completed or asked questions he considered to be stupid, and threatening to fire them or have them deported.

70.     As a means of intimidating and forcing Plaintiffs to comply with demands, the Hood Brothers reiterated to Plaintiffs that they were friends with the Sheriff in Earle and could have Plaintiffs arrested and sent to jail and deported.

71.     On at least one occasion, Rob Hood told Plaintiff Van Wyk that he would have him locked up and blocked from the U.S. Consulate if he did not do as he was told. Rob Hood cursed at him, saying Plaintiffs were the worst group of South Africans he had employed and that he "could get drunk n****** who could do the job better" than them.

72.     The Hood Brothers also sought to isolate Plaintiffs by restricting their movement off farm property. Although the Hood Brothers eventually provided Plaintiffs with access to a truck to use for errands on their off-time, they instructed Plaintiffs not to go anywhere but Earle, the nearest town, and gave Plaintiffs strict time limits for any excursions off the farm, including on Plaintiffs' days off. To enforce their limitations on Plaintiffs' trips off the farm, the Hood Brothers installed a tracking device on the truck Plaintiffs were permitted to use. If Plaintiffs deviated from the Hood Brothers' instructions by driving to another town a few miles away or taking longer to return than they were told, the Hood Brothers berated Plaintiffs and threatened that they could be terminated and sent back to South Africa for their disobedience.

73.     Feeling isolated, surveilled, and demoralized on a daily basis, all while grappling

with the debts they had incurred to come to the United States, Plaintiffs reasonably felt that the Hood Brothers' statements were threatening and felt forced to continue working at Hood Brothers Farms despite the abusive living and working conditions. Plaintiffs believed Rob Hood when he said that he could have them jailed at any time, and they felt that any minor deviation from his rules might cause him to lose his temper and have them deported or blacklisted at the U.S. Consulate.

### Plaintiffs' Departure from Hood Brothers Farms

74.     On or around April 3, 2018, Plaintiffs contacted Manuel Fick ("Fick"), the CEO of USA Farm Labor, a North Carolina-based recruitment agency that had facilitated Plaintiffs' employment with the Hood Brothers, with concerns about Rob Hood's verbal abuse, threats of deportation and jail, and severe anger. Fick suggested Plaintiffs express their concerns directly to Rob Hood.

75.     On the morning of April 4, 2018, Plaintiffs approached Rob Hood. Plaintiff Janse van Rensburg expressed that Plaintiffs were unhappy with the way the employment was going and asked if they could have a conversation.

76.     Rob Hood refused to have a conversation with Plaintiffs and, instead, immediately fired Plaintiffs Nieuwoudt and Janse van Rensburg. Rob Hood warned the remaining three Plaintiffs, Theunissen, Rabie, and Van Wyk, to keep quiet if they wanted to remain employed and not to communicate with Plaintiffs Nieuwoudt and Janse van Rensburg.

77.     Later in the day of April 4, 2018, the Hood Brothers instructed Plaintiff Nieuwoudt to take a ride in their truck with them. Plaintiff Nieuwoudt, who sat in the back of the truck, observed that a pair of handcuffs sat in the center console between the Hood Brothers during the ride.

14

78.     During the ride, the Hood Brothers berated, mocked, and yelled at Plaintiff Nieuwoudt. They mocked his South African accent and referred to all Plaintiffs as "a bunch of goddamn animals" and liars.

79.     Rob Hood threatened to sue Plaintiffs for defamation if they posted anything negative about him or the Hood Brothers on social media.

80.     The Hood Brothers then told Plaintiff Nieuwoudt that he and Plaintiff Janse van Rensburg should evacuate the premises by 10:00 a.m. the following morning and threatened to have the Sheriff arrest and deport them if there were any "shenanigans."

81.     The following morning, April 5, having witnessed Rob Hood fire Plaintiffs Janse van Rensburg and Nieuwoudt, and fearful that the Hood Brothers would follow through with their threats, Plaintiffs Van Wyk and Rabie informed Pat Greer that they planned to resign.

82.     Moments later, Rob Hood angrily entered the housing of Plaintiffs Van Wyk, Rabie, and Theunissen. Plaintiffs Van Wyk and Rabie explained that they wished to resign because Rob Hood's threats to have them blacklisted at the U.S. Consulate in South Africa, his verbal abuse, and the constant monitoring made working there unbearable. Rob Hood instructed all three Plaintiffs to immediately gather their belongings, including wet laundry, and leave the premises. Rob Hood threatened to call the Sheriff's department to send them to jail if they did not promptly comply.

83.     That same morning, at around 8:00 a.m., as Plaintiffs Nieuwoudt and Janse van Rensburg prepared to leave the farm, Rob Hood stormed into their housing and forcibly removed Plaintiff Nieuwoudt from the bath. Rob Hood ordered Plaintiffs Nieuwoudt and Janse van Rensburg to leave the property immediately. He then threatened to call the Sheriff and send them to jail if they did not immediately evacuate the premises.

84.     As a result of the Hood Brothers' intimidation, abuse, threats, and failure to reimburse Plaintiffs' their transportation expenses, Plaintiffs have suffered financial and emotional harm, including ever-growing debt, rifts with family members and friends from whom they borrowed money, anxiety, depression, fear, and loss of self-confidence.

85.     All actions and omissions of Hood Brothers Farms general partnership complained of herein were undertaken by its general partners Rob Hood or Mike Hood acting in the ordinary course of the partnership's business or with the authority of the partnership.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT (TVPRA)
Forced Labor (18 U.S.C. § 1589)

#### *All Plaintiffs Against All Defendants*

86.     Plaintiffs re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

87.     Plaintiffs bring this claim against all Defendants.

88.     Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the TVPRA, 18 U.S.C. § 1595.

89.     Rob Hood attempted to and did subject Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.

90.     Rob Hood knowingly attempted to and did threaten Plaintiffs with serious harm in order to obtain the labor and services of Plaintiffs, in violation of 18 U.S.C. § 1589(a)(2).

91.     Rob Hood knowingly attempted to and did obtain the labor and services of Plaintiffs using a scheme, plan, or pattern that, in the totality of the circumstances, was intended to and did coerce Plaintiffs to believe that they would suffer serious harm if they were to leave

16

the employ of Defendants, in violation of 18 U.S.C. § 1589(a)(4).

92.     Rob Hood's scheme to use threats of immigration consequences and financial harm was designed to convince Plaintiffs that they would suffer serious harm if they were to leave Defendants' employ and to falsely imprison them at the farm.

93.     Rob Hood threatened Plaintiffs with being prohibited from returning to the United States on a work visa and threatened to have Plaintiffs arrested, jailed, and deported, in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(a)(3).

94.     As a co-owner, employer, and supervisor of Hood Brothers Farms, Mike Hood knowingly benefitted financially from participation in a venture with his brother, Rob Hood, that he knew or should have known was engaged in the acts set forth in paragraphs 89–93, in violation of 18 U.S.C. § 1589(b).

95.     The partnership Hood Brothers Farms knowingly benefitted financially from participation in a venture in which it knew or should have known that partner Rob Hood was engaged in the acts set forth in paragraphs 89–93, in violation of 18 U.S.C. § 1589(b).

96.     As a proximate result of Defendants' conduct, Plaintiffs have suffered emotional injuries and other damages.

97.     Under the TVPRA, Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including:

   a.   damages for reimbursement of Plaintiffs' inbound travel expenses;

   b.   damages for emotional pain and suffering, including nervousness, grief, worry, mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, or ordeal experienced;

   c.   punitive damages; and

    d.  attorney's and expert fees, and costs as authorized by 18 U.S.C. § 1595.

## SECOND CLAIM FOR RELIEF
FAIR LABOR STANDARDS ACT (FLSA)

### *All Plaintiffs Against All Defendants*

98.    Plaintiffs re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

99.    Plaintiffs assert this claim for damages against Defendants pursuant to the FLSA, 29 U.S.C. § 201 *et seq.*

100.    In 2018, Defendants were Plaintiffs' employers and supervisors within the meaning of the FLSA, 29 U.S.C. § 203(d).

101.    While working for the Defendants in 2018, Plaintiffs were employed by Defendants within the meaning of the FLSA, 29 U.S.C. § 203(g).

102.    At all times relevant to this action, Plaintiffs were each "employee[s]" of Defendants within the meaning of the FLSA, 29 U.S.C. § 203(e).

103.    Defendants violated 29 U.S.C. § 206 by failing to pay Plaintiffs the applicable minimum wage of $7.25 per hour for every compensable hour of labor Plaintiffs performed in their respective first workweeks.

104.    The violations of the FLSA minimum wage requirement set forth in the preceding paragraph resulted from Defendants' unlawful de facto deductions from Plaintiffs' first workweek wages arising out of Defendants' failure to sufficiently reimburse Plaintiffs for their inbound costs.

105.    As a consequence of Defendants' violation of the FLSA, Plaintiffs are entitled to recover the following damages, including:

    a.  reimbursement of Plaintiffs' unpaid minimum wages;

b.  an additional amount in liquidated damages; and

c.  costs of suit and reasonable attorney's fees pursuant to 29 U.S.C. § 216(b).

## THIRD CLAIM FOR RELIEF
FRAUD

### *All Plaintiffs Against All Defendants*

106.    Plaintiffs re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

107.    Defendants made a false representation of material fact when Rob Hood, on behalf of Defendants, signed the Terms of Employment, promising travel reimbursement within the first week of employment.

108.    Defendants knew that the representation was false. After Plaintiffs arrived on the farm, Rob Hood admitted that the airfare of H-2A workers at Hood Brothers Farms had never been reimbursed in the past and stated that he did not intend to reimburse Plaintiffs for their airfare expenses.

109.    Defendants intended to induce action by Plaintiffs in reliance upon the representation.

110.    Defendants were familiar with the Terms of Employment and knew the term guaranteeing prompt reimbursement would induce Plaintiffs to sign the Terms of Employment and accept the positions at their farm.

111.    Plaintiffs justifiably relied on the representation when they expected Defendants to comply with the Terms of Employment.

112.    Plaintiffs would not have accepted the employment offer from Defendants absent the term promising reimbursement of inbound expenses within one week of arrival. All Plaintiffs borrowed money subject to conditions that demonstrated their reliance on the misrepresentation.

19

113.     Unable to repay their interest-bearing loans, Plaintiffs have suffered financial harm as a result of the misrepresentation.

114.     Plaintiffs seek all appropriate relief in an amount to be determined at trial, including:

> a.   compensation for all money paid in reliance on Defendants' promises, such as special and consequential damages that are the natural or proximate result of the fraud, including but not limited to travel expenses and fees and interest paid on any loans incurred as a result of Defendant's fraud; and
>
> b.   punitive damages.

### FOURTH CLAIM FOR RELIEF
BREACH OF CONTRACT

#### *All Plaintiffs Against All Defendants*

115.     Plaintiffs re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

116.     In 2018, Defendants were Plaintiffs' employers and supervisors within the meaning of the H-2A regulations, 20 C.F.R. § 655.103(b).

117.     At all times relevant to this action, Plaintiffs were each "employee[s]" and "H-2A worker[s]" of Defendants within the meaning of 20 C.F.R. § 655.103(b).

118.     The Terms of Employment signed by Rob Hood, on behalf of Defendants, and all Plaintiffs, in combination with the Clearance Order, constituted a valid employment contract containing all material terms of Plaintiffs' employment for the Hood Brothers.

119.     Plaintiffs performed all material contractual obligations of employment that they were called upon to perform under the terms of their employment contracts.

120.     Defendants breached the Plaintiffs' contracts by failing to reimburse Plaintiffs'

20

inbound transportation expenses within the first week of employment.

121.    Defendants violated Plaintiffs' contracts by failing to pay Plaintiffs the applicable AEWR rate of $10.73 per hour for every compensable hour of labor Plaintiffs performed in their respective first workweeks.

122.    Defendants' violations of the AEWR wage requirement set forth in the preceding paragraph resulted from Defendants' unlawful de facto deductions from Plaintiffs' first workweek wages arising out of Defendants' failure to reimburse Plaintiffs for the full amount of their inbound costs.

123.    Defendants failed to perform their obligations under their employment contract with each Plaintiff and materially breached their contractual obligations owed to each Plaintiff during the course of the 2018 season, including failing to properly train Plaintiffs and failing to refrain from firing Plaintiffs "in the heat of the moment."

124.    Defendants' breaches rendered Plaintiffs unable to pay off their debts incurred for inbound travel and caused Plaintiffs substantial injuries, including pecuniary harm, mental anguish, and emotional distress.

125.    Plaintiffs seek all appropriate relief, including but not limited to compensation for all moneys paid in order to come to the United States to work for Defendants, including but not limited to travel expenses, and fees and interest paid on any loans incurred as a result of Defendants' recruitment of Plaintiffs.

## FIFTH CLAIM FOR RELIEF
### PROMISSORY ESTOPPEL

### *All Plaintiffs Against All Defendants*

126.    Plaintiffs re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

127.    Plaintiffs bring this claim in the alternative pursuant to Rule 8(d)(2) of the Federal

Rules of Civil Procedure should the Court determine that Plaintiffs' claim for breach of contract,

as set forth in the Fourth Claim for Relief, *supra*, does not apply.

128.    The Terms of Employment were signed by Rob Hood, acting on behalf of Hood

Brothers Farms, and presented to Plaintiffs as part of their offers of employment with the

Defendants.

129.    Defendants promised to reimburse Plaintiffs' inbound travel expenses within the

first week of employment, as promised in the Terms of Employment signed by Rob Hood.

130.    Plaintiffs were required to sign the Terms of Employment.

131.    Defendants should have reasonably expected Plaintiffs to act in reliance on the

promise, given the prohibitively high cost of airfare to the U.S. and given the seemingly

contractual nature of the Terms of Employment.

132.    Plaintiffs acted in reasonable reliance on the promise to their detriment.

133.    Reliance on the promise presented to Plaintiffs in written, signed form as part of

their offers of employment was reasonable.

134.    Plaintiffs accepted the offers of employment from Defendants in reasonable

reliance on the promise. Plaintiffs would not have accepted an offer of employment from

Defendants absent the promise.

135.    Plaintiffs obtained loans from friends, family members, and financial institutions

to pay for their travel in reliance on the promise.

136.    Plaintiffs' loans have accrued interest as a result of Defendants' failure to

reimburse their travel expenses.

137.    Plaintiffs have suffered pecuniary harm, emotional distress, and strained personal

relationships as a result of their reasonable reliance on Defendants' promise.

138.   Injustice can be avoided only by enforcement of the promise to reimburse Plaintiffs' inbound travel expenses.

139.   Plaintiffs seek all appropriate relief, including but not limited to compensation for all moneys paid in order to come to the United States to work for Defendants, including but not limited to travel expenses, and fees and interest paid on any loans incurred as a result of Defendants' recruitment of Plaintiffs.

## SIXTH CLAIM FOR RELIEF
### ASSAULT AND BATTERY

### *Plaintiff Shaun Nieuwoudt Against All Defendants*

140.   Plaintiff Nieuwoudt re-alleges and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

141.   Plaintiff Nieuwoudt brings this claim of assault and battery, or assault and attempted battery, under Arkansas state law against all Defendants.

142.   Rob Hood intentionally placed Plaintiff Nieuwoudt in apprehension of imminent harmful or offensive contact when he barged into the bathroom and forcibly removed Plaintiff Nieuwoudt from the bath on the morning of April 4, 2018.

143.   Rob Hood's actions resulted in harmful or offensive contact with Plaintiff Nieuwoudt.

144.   Plaintiff Nieuwoudt did not consent to Rob Hood's contact with his person or to his forcible removal from the bath.

145.   Plaintiff Nieuwoudt suffered injury as a result of Rob Hood's actions, including mental, and emotional suffering.

146.   As a general partner in the Hood Brothers Farms general partnership, Mike Hood

23

is jointly and severally liable for Rob Hood's assault and battery of Plaintiff Nieuwoudt.

147.   As a general partnership, Hood Brothers Farms is liable for the assault and battery committed by Rob Hood because he committed the acts of assault and battery in his capacity as a partner of Hood Brothers Farms.

148.   As a result of Defendants' assault and battery, Plaintiff Nieuwoudt has experienced recurring fear, anxiety, and anguish associated with taking a bath and has had difficulty pursuing normal activities.

149.   Defendants are liable to Plaintiff Nieuwoudt for damages, including but not limited to:

      a.   compensatory damages for emotional pain and suffering, including fright, nervousness, grief, worry, mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, terror, or ordeal experienced as a result of the assault and battery or assault and attempted battery; and

      b.   punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an order:

(a)   Declaring that Defendants, by the acts and omissions described above, violated Plaintiffs' rights under the forced labor provision of the TVPRA at 18 U.S.C. § 1589 as set forth in Plaintiffs' First Cause of Action;

(b)   Granting judgment in favor of Plaintiffs on their TVPRA forced labor claim as set forth in their First Cause of Action and awarding them damages, including compensatory and punitive damages, and attorney's fees;

(c)   Declaring that Defendants, by the acts and omissions described above, violated

Plaintiffs' rights under the minimum wage provisions of the FLSA at 29 U.S.C. § 206(a) as set forth in Plaintiffs' Second Cause of Action;

(d)     Granting judgment in favor of Plaintiffs on their FLSA minimum wage claim as set forth in their Second Cause of Action and awarding them their unpaid minimum wages, an equal amount in liquidated damages, costs of court, and attorney's fees;

(e)     Granting judgment in favor of Plaintiffs on their fraud claim as set forth in their Third Cause of Action and awarding them compensatory and punitive damages for Defendants' fraud;

(f)     Granting judgment in favor of Plaintiffs on their contract claim as set forth in their Fourth Cause of Action and awarding them damages for Defendants' contractual breaches;

(g)     Granting judgment in favor of Plaintiffs on their promissory estoppel claim as set forth in their Fifth Cause of Action, should the Court determine that Plaintiffs' claim for breach of contract as set forth in the Fourth Cause of Action does not apply, and awarding Plaintiffs damages for their detrimental reliance;

(h)     Granting judgment in favor of Plaintiff Nieuwoudt on his assault and battery claim as set forth in the Sixth Cause of Action and awarding him damages, including compensatory and punitive damages;

(i)     Awarding Plaintiffs pre- and post-judgment interest, as allowed by law;

(j)     Awarding Plaintiffs their costs; and

(k)     Granting such other relief as this Court deems just and appropriate.

Respectfully submitted,

Joshua D. Gillispie, Ark. Bar No. 2010131
GREEN AND GILLISPIE

25

1 Riverfront Place, Suite 605
North Little Rock, AR 72114
Telephone: (501) 244-0700
Facsimile: (501) 244-2020
josh@greenandgillispie.com

John L. Burnett, Ark. Bar No. 77021
LAVEY AND BURNETT
904 W.2d St.
Little Rock, AR 72201
Telephone: (501) 376-2269
Facsimile: (501) 372-1134
jburnett@laveyandburnett.com


*/s/ Melia Amal Bouhabib*
Melia Amal Bouhabib, TN Bar No. 035588
*Pro Hac Vice Motion Forthcoming*
SOUTHERN MIGRANT LEGAL SERVICES
A Project of Texas RioGrande Legal Aid, Inc.
311 Plus Park Blvd., Ste. 135
Nashville, TN 37217
Telephone: (615) 538-0725
Facsimile: (615) 366-3349
abouhabib@trla.org

*/s/ Caitlin Berberich*
Caitlin Berberich. TN Bar No. 025780
*Pro Hac Vice Motion Forthcoming*
SOUTHERN MIGRANT LEGAL SERVICES
A Project of Texas RioGrande Legal Aid, Inc.
311 Plus Park Blvd., Ste. 135
Nashville, TN 37217
Telephone: (615) 538-0725
Facsimile: (615) 366-3349
cberberich@trla.org

ATTORNEYS FOR PLAINTIFFS

# EXHIBIT A



**U.S. Department Labor**
**Employment and Training Administration**

OMB Control No. 1205-0134
Expiration Date: March 31, 2019

### Agricultural and Food Processing Clearance Order ETA Form 790
### Orden de Empleo para Obreros/Trabajadores Agrícolas y Procesamiento de Alimentos

**(Print or type in each field block – To include additional information, go to block # 28 – Please follow Step-By-Step Instructions)**
**(Favor de usar letra de molde en la solicitud – Para incluir información adicional vea el punto # 28 – Favor de seguir las instrucciones paso-a-paso)**

---

1. Employer's and/or Agent's Name and Address (Number, Street, City, State and Zip Code / Nombre y Dirección del Empleador/Patrón y/o Agente (Número, Calle, Ciudad, Estado y Código Postal):

USAFARMLABOR, INC., 686 Mauney Cove Rd., Waynesville, NC 28786  (828) 246-0659   AGENT FOR:

**Hood Brothers Farms;Rob Hood**
**P: 263 S. Hood Rd Earle, AR 72331**
**M: 508 Harvest Circle Marion, AR 72364**

a) Federal Employer Identification Number (FEIN) / Número federal de Identificación del Empleador:

**71-0711259**

b) Telephone Number / Número de Teléfono:

**870-636-1354**

c) Fax Number / Número de Fax:

**N/A**

d) E-mail Address / Dirección de Correo Electrónico:

**N/A**

2. Address and Directions to Work Site / Domicilio y Direcciones al lugar de trabajo:

**263 S. Hood Rd., Earle, AR 72331**

**Directions: From Earle, AR head west on US-64 W. Take the 1st right onto AR-149/Barton St. Turn left onto AR-42 W. Turn right onto S Hood Rd. Destination will be on the left.**

3. Address and Directions to Housing / Domicilio y Direcciones al lugar de vivienda:

**1) 261 Twist Hwy, Earle, AR 72331**
**2) 191 S Hood Rd Earle, AR 72331**
**3) 263 S Hood Rd Earle, AR 72331**

a) Description of Housing / Descripción de la vivienda:

Directions: From Memphis, TN, follow signs to Little Rock, AR to West Memphis, Marion. From Marion, take US 64 to Earle, AR (approx. 22 miles). Take Hwy 149 north to intersection of Hwy 42. First shop on left (approx. 1/4 mile on Hwy 42).

Directions 2: From Earle, AR head west on US-64 W. Take the 1st right onto AR-149/Barton St. Turn left onto AR-42 W. Turn right onto S Hood Rd. Destination will be on the left.

Directions 3: From Earle, AR head west on US-64 W. Take the 1st right onto AR-149/Barton St. Turn left onto AR-42 W. Turn right onto S Hood Rd. Destination will be on the left.

Description 1: Employer owned 3 bedroom farm house with 3 beds; accommodates 3.
Description 2: Employer owned 3 bedroom trailer with 4 beds; accommodates 4.
Description 3: Employer owned 3 bedroom trailer with 5 beds; accommodates 5.

(See Attachment)

---

**Nos. 4 through 8 for STATE USE ONLY**
**Números 4 a 8 para USO ESTATAL**

4. SOC (O*NET/OES) Occupational Code / Código Industrial:

**45-2091**

a. SOC (ONET/OES) Occupational Title / Título Ocupacional

**Ag. Equipment Operators**

5. Job Order No. / Num. de Orden de Empleo:

**2085174**

6. Address of Order Holding Office (include Telephone number) / Dirección de la Oficina donde se radicó la oferta (incluya el número de teléfono):

**John Newkirk**
**PO Box 2981**
**Little Rock, AR 72203**

a. Name of Local Office Representative (include direct dial telephone number) / Nombre del Representante de la Oficina Local (Incluya el número de teléfono de su línea directa).

7. Clearance Order Issue Date / Fecha de Emisión de la Orden de Empleo:

**12|4|17**

8. Job Order Expiration Date / Fecha de Vencimiento o Expiración de la Orden de Empleo:

**7|16|18**

9. Anticipated Period of Employment / Período anticipado o previsto de Empleo:

From / Desde: **02/15/2018**   To / Hasta: **12/15/2018**

10. Number of Workers Requested / Número de Trabajadores Solicitados:

**10 (See Attachment)**

11. Anticipated Hours of Work per Week / Horas Anticipadas/Previstas de Trabajo por Semana. Total: **48**

Sunday / Domingo **0**        Thursday /Jueves **8**
Monday / Lunes **8**          Friday / Viernes **8**
Tuesday / Martes **8**        Saturday / Sábado **8**
Wednesday / Miércoles **8**

12. Anticipated range of hours for different seasonal activities: / Rango previsto de horas par alas diferentes actividades de la temporada:

**48 minimum per/week**

13. Collect Calls Accepted from: / Aceptan Llamadas por Cobrar de:

Employer / Empleador:        Yes / Si ☑   No ☐

14. Describe how the employer intends to provide either 3 meals a day to each worker or furnish free and convenient cooking and kitchen facilities for workers to prepare meals / Describa cómo el empleador tiene la intención de ofrecer, ya sea 3 comidas al día a cada trabajador, o proporcionar gratuitamente instalaciones para cocinar.

Workers will purchase food and prepare meals in employer provided fully equipped kitchen. Employers will make sure workers have access to a grocery store at least once per week.

15. Referral Instructions and Hiring Information  / Instrucciones sobre cómo Referir Candidatos/Solicitantes - (Explain how applicants are to be hired or referred, and the Employer's/Agent's available hour to interview workers / Explique cómo los candidatos serán contratados o referidos, y las horas disponibles del empleador/agente para entrevistar a los trabajadores.  See instructions for more details / Vea las instrucciones para más detalles.

Referrals accepted from local Job Service, Word-of-mouth, gate hires etc. Order holding office to refer applicants. Office hrs 8-5pm CT time, Mon-Fri, at 870-636-1354. (See Attachment)

The actual employment offer is at the sole discretion of the employer. Referrals will be accepted from the State Workforce Agencies (SWAs), directly from applicants, walk-ins, gate hires, and from other sources. SWA's should thoroughly familiarize each applicant with the job specifications and terms and conditions of employment before a referral is made. Workers must meet all of the following criteria:
1. Are available and indicate willingness to work the entire season.
2. Have transportation to job site at start of season.  Transportation costs will be reimbursed.
3. Have been fully apprised by the local employment office of the terms, conditions, and nature of employment.
4. Are legally entitled to work in the U.S.
5. Are able, willing and qualified to perform the work.
Worker must possess documentation required to enable employer to comply with the employment verification requirements of IRCA. Accurate completion of Form I-9 will be required of each worker within (3) days of employment pursuant to U.S. Law. Employer will abide by the requirements and assurances of 20 CFR § 653.501 in the processing and/or hiring of individuals referred through the clearance system.
----------------------------------------------------------------------------------------------------------------
La oferta actual de empleo es a la sola discreción del empleador. Las referencias serán aceptadas de las Agencias Estatales de Trabajadores (swas), directamente de los solicitantes, sin cita previa, empresas de alquiler de compuerta, y de otras fuentes. SWA de familiarizar a fondo cada solicitante con las especificaciones de trabajo y los términos y condiciones de empleo antes de que se haga una referencia. Los trabajadores deben cumplir con todos los siguientes criterios:
1. Están disponibles e indicar la voluntad de trabajar toda la temporada.
2. Hacer que el transporte al lugar de trabajo al comienzo de la temporada. Los costos de transporte serán reembolsados.
3. ¿Ha recibido información plena por la oficina local de empleo de los términos, condiciones, y la naturaleza del empleo.
4. legalmente tienen derecho a trabajar en los EE.UU.
5. ¿Es capaz, dispuesto y calificado para realizar el trabajo.
Trabajador debe poseer los documentos requeridos para que el Patrón pueda cumplir con los requisitos de verificación de empleo de IRCA. Se requerirá la terminación exacta de la Forma I-9 de cada trabajador dentro de (3) días de empleo de conformidad con la Ley EE.UU.. Empleador cumplir con los requisitos y garantías de 20 CFR § 653.501 en la transformación y / o contratación de los individuos que se refiere a través del sistema de compensación.

16. Job description and requirements / Descripción y requisitos del trabajo:

Performs duties like: drive and operate farm machinery to plant, cultivate, harvest and store grain crops. Attach farm implements, such as plow, disc and drill to tractor. Till soil; plant and cultivate grain. Tow harvesting equipment. Drive and operate self-propelled combine. Perform a variety of duties such as lubricating and repairing farm machinery and driving grain trucks to transport crops to elevator or storage area. Wage rate may increase with verifiable experience with our company. Must be able to lift 60 lbs. Minimum of (12) months experience required. Must be able to obtain a driver's license within 30-90 days of hire. No minimum education required.

Spanish Translation- (See Attachment)

1. Is previous work experience preferred? / Se prefiere previa experiencia?   Yes / Si ■   No ❑   If yes, number of months preferred: / Si es así, numero de meses de experiencia: _12_

2. Check all requirements that apply:

❑ Certification/License Requirements / Certificación/Licencia Requisitos
■ Driver Requirements / Requisitos del conductor
❑ Employer Will Train / Empleador entrenará o adiestrará
❑ Extensive Sitting / Estar sentado largos ratos
❑ Exposure to Extreme Temp. / Expuesto a Temperaturas Extremas
■ Lifting requirement / Levantar o Cargar _60_ lbs./libras
❑ Repetitive Movements / Movimientos repetitivos

❑ Criminal Background Check / Verificación de antecedentes penales
❑ Drug Screen / Detección de Drogas
❑ Extensive Pushing and Pulling / Empujar y Jalar Extensamente
❑ Extensive Walking / Caminar por largos ratos
❑ Frequent Stooping / Inclinándose o agachándose con frecuencia
❑ OT/Holiday is not mandatory / Horas Extras (sobre tiempo) / Días Feriados no obligatorio

**17. Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Rebajas)**

| Crop Activities | Hourly Wage | Piece Rate / Unit(s) | Special Pay (bonus, etc.) | Deductions* x | Yes/Sí | No | Pay Period / Periodo de Pago |
|---|---|---|---|---|---|---|---|
| Cultivos | Salario por Hora | Pago por Pieza / Unidad(es) | Pagos Especiales (Bono, etc.) | Deducciones | | | / / |
| Planting | $ 10.38 | $ | | Social Security / Seguro Social | ✓ | ☐ | Weekly / Semanal |
| Cultivating | $ 10.38 | $ | | Federal Tax / Impuestos Federales | ✓ | ☐ | ☐ |
| Harvesting | $ 10.38 | $ | | State Tax /Impuestos Estatales | ✓ | ☐ | Bi-weekly/ Quincenal |
| Equip. Repair & Maint. | $ 10.38 | $ | | Meals / Comidas | ☐ | ✓ | ☐ |
| (See Attachment) | $ | $ | | Other (specify) / Otro (especifica) | ✓ | ☐ | Monthly/Mensual ☐ |
| | | | | | | | Other/Otro _Twice Monthly_ MF |

**18. More Details About the Pay / Mas Detalles Sobre el Pago:**

The employer guarantees to offer, advertise and pay a wage defined as the highest of the USDOL-promulgated AEWR, the prevailing hourly wage or piece rate, an agreed-upon collective bargaining wage (this employer is not subject to a collective bargaining agreement) or the federal or state minimum wage in effect at the time work subject to the provisions of the job order is performed. This guaranteed wage will not be based on commission , bonuses, or other incentives. (See Attachment)

**19. Transportation Arrangements / Arreglos de Transportación**

(See Attachment)

20. Is it the prevailing practice to use Farm Labor Contractors (FLC) to recruit, supervise, transport, house, and/or pay workers for this (these) crop activity (ies)? / ¿Es la práctica habitual usar Contratistas de Trabajo Agrícola para reclutar, supervisar, transportar, dar vivienda, y/o pagarle a los trabajadores para este(os) tipo(s) de cosecha(s)?        Yes / Si      ☐          No ■

If you have checked yes, what is the FLC wage for each activity? / Si contestó "Sí," cuál es el salario que le paga al Contratista de Trabajo Agrícola por cada actividad?

N/A

21. Are workers covered for Unemployment Insurance? / ¿Se le proporcionan Seguro de Desempleo a los trabajadores?          Yes/Si ☐   No ■

22. Are workers covered by workers' compensation? / ¿Se le provee seguro de compensación/indemnización al trabajador:          Yes/Si ■   No ☐

23. Are tools, supplies, and equipment provided at no charge to the workers? / ¿Se les proveen herramientas y equipos sin costo alguno a los trabajadores?

Yes/Si ■   No ☐

24. List any arrangements which have been made with establishment owners or agents for the payment of a commission or other benefits for sales made to workers. (If there are no such arrangements, enter "None".) / Enumere todos los acuerdos o convenios hechos con los propietarios del establecimiento o sus agentes para el pago de una comisión u otros beneficios por ventas hechas a los trabajadores. (Si no hay ningún acuerdo o convenio, indique "Ninguno".)

NONE

25. List any strike, work stoppage, slowdown, or interruption of operation by the employees at the place where the workers will be employed. (If there are no such incidents, enter "None".) / Enumere toda huelga, paro o interrupción de operaciones de trabajo por parte de los empleados en el lugar de empleo. (Si no hay incidentes de este tipo, indique "Ninguno".)

N/A

26. Is this job order to be placed in connection with a future Application for Temporary Employment Certification for H–2A workers? / ¿Esta orden de empleo ha sido puesta en conexión con una futura solicitud de certificación de empleo temporal para trabajadores H-2A?

Yes/Si ■   No ☐

27. Employer's Certification: This job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job. / Certificación del Empleador: Esta orden de trabajo describe los términos y condiciones del empleo que se le ofrece, y contiene todos los términos y condiciones materiales ofrecidos.

*Robert Hood   Owner*

Employer's Printed Name & Title / Nombre y Título en Letra de Molde/Imprenta del Empleador

*Rnt Hood*                              *11/17/17*

Employer's Signature / Firma y Título del Empleador          Date / Fecha

**READ CAREFULLY**, In view of the statutorily established basic function of the Employment Service as a no-fee labor exchange, that is, as a forum for bringing together employers and job seekers, neither the Employment and Training Administration (ETA) nor the State agenci es are guarantors of the accuracy or truthfulness of information contained on job orders submitted by employers. Nor does any job order accepted or recruited upon by the American Job Center constitute a contractual job offer to which the American Job Center, ETA or a State agency is in any way a party.

**LEA CON CUIDADO**, En vista de la función básica del Servicio de Empleo establecida por ley, como una entidad de intercambio laboral sin comisiones, es decir, como un foro para reunir a los empleadores y los solicitantes de empleo, ni ETA ni las agencias del estado pueden garantizar la exactitud o veracidad de la información contenida en las órdenes de trabajo sometidas por los empleadores. Ni ninguna orden de trabajo aceptado o contratado en el Centro de Carreras (American Job Center) constituyen una oferta de trabajo contractuales a las que el American Job Center, ETA o un organismo estatal es de ninguna manera una de las partes.

**PUBLIC BURDEN STATEMENT**
The public reporting burden for responding to ETA Form 790, which is required to obtain or retain benefits (44 USC 3501),  is estimated to be approximately 60 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and reviewing the collection. The public need not respond to this collection of information unless it displays a currently valid OMB Control Number. This is public information and there is no expectation of confidentiality.  Send comments regarding this burden estimate or any other aspect of this collection, including suggestions for reducing this burden, to the U.S. Department of Labor, Employment and Training Administration, Office of Workforce Investment, Room C-4510, 200 Constitution Avenue, NW, Washington, DC 20210.

**DECLARACION DE CARGA PÚBLICA**
La carga de información pública para responder a la Forma ETA 790, que se requiere para obtener o retener beneficios (44 USC 3501), se estima en aproximadamente 60 minutos por respuesta, incluyendo el tiempo para revisar las instrucciones, buscar fuentes de datos existentes, recopilar y revisar la colección. El público no tiene por qué responder a esta recopilación de información a menos que muestre un número de control OMB válido. Esta información es pública y no hay ninguna expectativa de confidencialidad. Envíe sus comentarios acerca de esta carga o cualquier otro aspecto de esta colección, incluyendo sugerencias para reducir esta carga, al U.S. Department of Labor, Employment and Training Administration, Office of Workforce Investment, Room C-4510, 200 Constitution Avenue, NW, Washington, DC 20210.

28.  Use this section to provide additional supporting information (including section Box number).  Include attachments, if necessary. / Utilice esta sección para proporcionar
     información adicional de apoyo; incluya  el numero de la sección e incluya  archivos adjuntos, si es necesario.

**(See Attachment)**

# EXHIBIT B

# SUMMARY OF TERMS OF EMPLOYMENT

EMPLOYER: _Hood Brothers Farms_

EMPLOYEE: _____

JOB DESCRIPTION: See **job description on Page 3 of the ETA Form 790**, attached to this Summary of Terms of Employment.

## NOTICE OF TERMS OF EMPLOYMENT:

The employer, _Hood Brothers Farms_, believes that it is important that all employees understand the terms and conditions of their employment. The purpose of this document (**Summary of Terms of Employment**) is to let you know, in general terms, what those terms and conditions of employment contain. This document (**Summary of Terms of Employment**) is not a contract of employment; rather, it is a general summary of the terms and conditions set forth in the Job Order listed on the **ETA Form 790** from the U.S. Department of Labor. You will be provided a copy of the **ETA Form 790**. If there is a difference between this document (**Summary of Terms of Employment**) and the Job Order (**ETA Form 790**), the Job Order (**ETA Form 790**) has precedence. However, if there is a difference between this document (**Summary of Terms of Employment**) and any law, the law has precedence.

1. Our season goes from _2/15/18_ to _12-15-18_. Because uncontrollable variables make it very difficult to predict exactly how long it will take to finish our work for the season, we may finish before the end date. We will let you know if this likely to happen. Also, if more time is necessary, we may try to get an extension from the government and ask you to work with us a little longer.

2. There will be an initial **orientation period** of 2 weeks (up to 12 work days), during which you will be expected to learn the basics of our operation and show that you can do the job well. Some of the things that we will do will involve work while others will not. You will, of course, be paid for any work you perform during the orientation period. If, at the end of the orientation, you haven't shown us that you can do the job well, your employment might be terminated. We will discuss the situation if necessary.

3. The **Orientation Period** will consist, among other things, of:
   - becoming familiar with the farm, equipment, etc.;
   - applying for and/or obtaining a social security number and card;
   - applying for a State Driving License and/or CDL License;
   - practicing driving the vehicles and equipment, under the employer's supervision;
   - being taken to town to buy initial food and supplies, and
   - opening a bank account.

4. Your first payday will be on _1st or 15th EG_
   You will then be paid on a ☐ weekly / ☒ bi-weekly/ ☒ semi-monthly basis.
   Your pay rate will be _$10.73_. There is more information below.

_____ (Please Initial)                                    ©2018 USAFARMLABOR, Inc. All Rights Reserved.

5.  Unless your employment ends for cause or due to a catastrophe, we will offer you, over the course of a season, at least enough work to cover ¾ of the work hours in the agreed-upon season. We will calculate this in the way set out in the law. If you are not offered that minimum number of hours, we will reimburse you to make up the difference at the end of the contract period. You should review the Job Order (**ETA Form 790**) for more details.

6.  Please remember that we are required to hire qualified domestic workers who apply before the half-way point of the contract period. If you are a foreign worker and this happens, you might have to return to your home country early. If that happens, the ¾ guarantee does not apply, but USAFARMLABOR, Inc. will attempt to find you another employment opportunity in the U.S.

7.  In general, we offer a 48-hour workweek. Some weeks may have more work, while others may have less. Sometimes, we may ask you to work on your Sabbath or on a federal holiday. However, if we do, you may decline without fear of being reprimanded.

8.  On a work day, your time will start when you begin working, and all work time will count toward your daily total. If you have a question about whether particular time is work time, ask us. You should be aware that H-2A agricultural work (including farming and tending to livestock) is exempt from overtime. You will be paid the rate listed above for all the work you perform. You will not, of course, be paid if you do not work.

9.  It is important to us that you are paid correctly. We will meet with you at the end of the season to check whether you were paid for all your work. However, we encourage you to bring any mistakes to our attention as soon as possible. You may do so without fear of being reprimanded or affecting your employment status.

10. You agree to keep accurate and truthful records of your working hours. We will sign off on your hours on a ☐ daily / ☐ weekly / ☐ bi-weekly/ ☐ semi-monthly basis. After your hours have been verified, you will receive a pay slip or other document that will provide the following information:
    *   your name,
    *   the address of Employer,
    *   the FEIN number of employer,
    *   the pay period (clearly stipulated dates),
    *   the rate of pay per hour,
    *   any deductions (not at all allowed in this program),
    *   the number of hours offered each day,
    *   the start time every day,
    *   the end time every day,
    *   the total number of hours for each day,
    *   the total hours for this pay period,
    *   the total amount paid for this period,
    *   the date this pay was issued,
    *   place for you to sign, and
    *   place for the employer to sign.

    It is important for you to keep a copy of each of these pay slips for later.

 (Please Initial)          Page 2 of 7          ©2018 USAFARMLABOR, Inc. All Rights Reserved.

11. We will provide you with government-inspected housing. If you believe that there is a problem with the housing, please let us know. If you have alerted us to a problem and we have not resolved it, you may contact USAFARMLABOR, Inc. (the U.S. Agency), and someone there will try to resolve the issue. Also, you may always contact the U.S. Department of Labor. Please bring any issues with your housing to our attention as soon as possible. You may do so without fear of being reprimanded or affecting your employment status.

12. You are responsible for your own food. We will:

☐ Furnish **free and convenient cooking and kitchen facilities** for you to use to prepare your own meals. We will also provide you with free transportation once a week to be able to purchase the necessary groceries.

☐ **Provide you with three meals a day** and charge you a maximum of $12.07 per day. If we decide to charge more than this daily amount, then we will have to submit documentation to the U.S. Department of Labor to support a greater amount. Otherwise, we will charge you the exact amount, up to the maximum of $12.07 per day.

☐ **Make arrangements with a restaurant** (e.g. Subway) to provide you with food. If this option is used, we may deduct the $12.07 from your pay per day. However, if the food ordered exceeds $12.07 and you provide proof in the form of receipts, we will pay the difference, and will not deduct that from your pay.

13. We provide **Workers' Compensation** insurance without cost to you. This insurance will cover the costs incurred from injuries on the job as well as replace your income in the event that you are unable to work during your recovery. We agree to help you to file a claim with Workers' Compensation if you are involved in a work-related accident.

14. We will take you to the nearest Social Security office to apply for a Social Security number and card within the first 2 weeks of arrival. The government will use this to track your earnings and your eligibility for benefits. Social Security information is also important for tax reasons.

15. We will provide you with the necessary, accommodations, tools, and equipment at no cost to you.

16. We will reimburse your consulate fee of **$190.00** within 48 hours of your arrival at our worksite.

17. We will keep, on file, copies of your passport, visa, I-94, plane ticket, and driver's license. However, you should keep original immigration documents in your possession at all times. Keeping the original documents safe and in good condition is your responsibility.

18. You assured us that you have a valid International Driver's license and/or Driver's license from your home country. Driving is an important part of your job. We will do what we can to help you obtain the proper licenses to perform the work as described in the job description on the ETA Form 790 we gave you. We will pay for CDL testing unless you do not pass. If you do not pass, the cost will be your responsibility. Unfortunately, if you cannot obtain the proper licenses, your employment may be terminated.

19. Here is some general information about taxes.  Taxes are complicated, so double check with the IRS, State regulations, or an accountant before relying on this Summary of Terms of Employment.

- Since 2008, H-2A workers have been responsible for their own taxes.  If you worked here in the country for a time before 2008, you may remember things a little differently.  There have been some changes and/or updates with the IRS and, if applicable, State requirements.

- You agree to take responsibility for your U.S. Federal (and, if applicable, State) tax obligation, based on the Non-Resident Alien "Substantial Presence Test" (Tax obligation information available from USAFARMLABOR, Inc., upon request).

- The applicable Federal rate starts at 15% of the annual income you receive.

- You acknowledge that you are responsible for filing Federal tax filings in the form of a 1040EZ or a 1040 + Schedule C (listing deductions) to the IRS every year you work in America (State taxes may be applicable as well).

- You also may have a tax obligation in your home country.  Again, you are responsible for your tax obligation.  You are also responsible for providing proof to the U.S. Consulate in your home country of tax filing and payment.  The consulate may reject your request for a visa if your tax obligations have not been fulfilled.

- You may ask us to withhold the Federal taxes on your behalf.  In that case, we will pay your taxes directly to the IRS on a monthly basis.  To make an official request, you must complete a W-4 form.

20. Here is some information about travel reimbursement.  We calculate your travel reimbursement based on the most economical common carrier cost.  If you decide to fly when a bus is available, that is your choice.  We will still use bus fare as the basis for reimbursement.  Of course, if we require you to fly, we will reimburse the cost of the flight.  We will reimburse you for these expenses within your first week of work with us.

We will pay the prescribed daily travel subsistence (as required by the U.S. Department of Labor) cost of **$12.07** per day (the minimum amount without receipts), for the time it takes you to travel from your home country to the U.S.  The trip usually takes approximately 1 and ½ days.  In that case, we will calculate your subsistence cost as **$12.07 + $6.05 = $18.12**.  However, if you provide receipts, you will be eligible for up to **$51.00** per day for travel subsistence.

Also, if you drive to our worksite, we will reimburse you for the cost of gas for the distance between your accommodations/current location and our worksite. This is subject to each receipt you provide to us for reimbursement.

☐ (Optional) If there is a death in your immediate family while you are in the U.S., we will reimburse the balance of your remaining (original) airplane ticket that was used for this contract period. This will only be paid after you have submitted an official death certificate to us.

21. Here is some information concerning deductions.  Simply put, unless specified on the ETA FORM 790, we will not deduct from your paycheck.  If we provide optional services and you voluntarily agree to utilize those services, we will pay the service for you in full and then will require you to reimburse us for the service. If you break something, your employment could be terminated, but we will not deduct pay from your paycheck, unless specified on the ETA Form 790.

22. We may terminate your employment at will (for no specific reason) or for cause (for a specific reason).  Specific reasons include, but are not limited to, the following examples:

- If you refuse, without just cause, to perform the work described on the ETA Form 790.

- If we believe you were dishonest about your skills, references, level of experience, or any aspects of employment with us.

- If you commit any serious act of misconduct.

- If you do not behave in a civil manner towards us or your co-workers during and/or after work hours. Remember, unruly behavior, such as swearing, fighting, or excessive drinking will be a serious cause for dismissal.

- If, since the start of your employment with us, you break any laws, including possession of illicit drugs, DUI/DWI, etc.

If your employment is terminated for cause, the ¾ guarantee rule will not apply.  If your employment is terminated due to an Act of God, like a severe drought or other natural disaster that ends that season's work, the ¾ guarantee period ends on the day of termination.

We reserve the right to terminate your employment at any time.  If we terminate your employment early without cause, we will pay you the ¾ guarantee (if we have not offered enough hours yet), as required by law.  If you quit early, however, we are not legally bound to abide by the ¾ guarantee offer.

We will give you a chance to confirm to us that you can do the job as described on the ETA Form 790.  If you are unable to operate the required equipment, as reflected in the ETA Form 790, we will give you two (2), five (5)-hour sessions to familiarize yourself with the equipment. If you are then still unable to operate the equipment after that, we may terminate your employment and end your contract.

We will show you the specific tasks you will need to accomplish over this contract period.  If you do not understand the task or what is expected of you, please let us know as soon as possible and we will do our best to clarify the matter.  If, after thirty (30) days, you are still unable to perform the job duties as listed on the ETA Form 790, we may terminate your employment and end your contract at that point.

Whatever the case, if your employment ends early, we will notify USAFARMLABOR, Inc., the U.S. Department of Labor, and the U.S. Department of Homeland Security.

23. We will abide by all the applicable legal requirements and regulations.  We expect that you will do the same. The following are some rules and regulations to keep in mind:

 (Please Initial)                    Page 5 of 7                    ©2018 USAFARMLABOR, Inc. All Rights Reserved.

- You may not work for another employer without approval from the USCIS.

- You must return to your home country within 30 days after the termination of your employment (unless you receive approval from USCIS to stay and work elsewhere).

- You may, of course, search for new and lawful H-2A employment during the 30-day grace period after your employment is terminated, but an application must be filed on your behalf with the USCIS before your visa expires or the 30 days pass.

- You may not pay any fees to your recruiter. Let us know immediately if someone asks you to pay any fees, or if you have paid any fees. We will take care of the situation by seeking reimbursement from that person. Once you have received any reimbursement, you will be asked to sign an attestation that you were reimbursed for any such fees.

24. Other requirements which the law does not require but which you still agree to abide by:

- You agree to only speak English in our presence or over radio/phone communications. Doing otherwise is impolite and breeds distrust and disunity and can cause safety issues.

- You agree to provide accurate information regarding your skills. You could be dismissed if you are unable to perform the stated skills.

- You agree to complete an employer evaluation for the USAFARMLABOR, Inc. database.

  ☐ (Optional) You agree to keep the provided housing neat and clean. You will be charged $20 per month if the housing is deemed to be in an unsatisfactory condition. This charge will apply to cover any deliberate breakages, unreasonably neglected messes, or if you have disobeyed any rules specified for the accommodation (for example: if smoking is prohibited). If the housing is then returned in a satisfactory manner at the end of the employment period, however, the charged monthly fees will be returned in full.

25. You understand that, if you are injured on the job, you must file a claim with our workers' compensation provider and report the injury to us and USAFARMLABOR, Inc. as soon as possible. If you have questions regarding our workers' compensation policy, we can provide you with the necessary information.

26. If a dispute arises, you agree to abide by the following guidelines:

First of all, you agree that, if a dispute arises, you will immediately discuss the issue with us, your employer. We will try to work something out with you. We cannot guarantee that we will be able to deal with an issue in the way that you want but will do our best to find a mutually beneficial solution.

If you feel that you cannot discuss the issue with us or do not want to, we ask that you notify your Agent first, and request that they act as a mediator between us. You will not be reprimanded for doing so. You agree to never, in the heat of the moment, pack your possessions and leave the premises without first seeking an audience with us, your Agent, and/or

USAFARMLABOR, Inc. to attempt to resolve the issue.  It is our responsibility to immediately (within 2 days) report an absconded worker to the U.S. Department of Homeland Security and the U.S. Department of Labor. Therefore, if you do leave without letting us know, we are required by law to report that you absconded.

Similarly, we agree to never, in the heat of the moment, terminate your employment, and demand that you vacate the premises without first trying to resolve the issue amicably and/or reporting the issue to USAFARMLABOR, Inc. and/or the appropriate Recruiting Agency.

At any time (with or without talking to us first), you may report anything to the U.S. Department of Labor's Wage and Hour Division. The number is: 1-866-487-9243. See website for a State-specific list.


SIGNATURE OF EMPLOYER: _____    Date: _11-21-17_

SIGNATURE OF EMPLOYEE: _____    Date: _____